## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CAROL NICHOLS, on behalf of herself and )
similarly situated employees, )
        )
       Plaintiff(s) )
        )
v. )       Civil Action No.
        )
        )
Denver Health and Hospital Authority )
        )
       Defendant. )

---

### COMPLAINT AND JURY DEMAND

---

### NATURE OF THE ACTION

This employment action seeks to enforce rights and remedies guaranteed by, *inter alia,* Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e *et seq.* ("Title VII"); by Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a; and by Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); and to provide relief to Plaintiff Carol Nichols and other similarly situated employees of Defendant Denver Health and Hospital Authority (DHHA), who have been adversely affected by DHHA's violation of (if not outright disregard for) such employment rights, as detailed below.

## JURISDICTION AND VENUE

1.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to 107(a) and 503(c) of the ADA, 42 U.S.C. §§ 12117(a) and 12203(c), which incorporate by reference Sections 706(f)(l) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(l) and (3),  and  pursuant  to  Section 102  of  the  Civil  Rights Act of 1991, 42 U.S.C. § 1981a.

2.    The unlawful employment practices alleged were committed within the jurisdiction of the United States District Court for the District of Colorado.

3.    On August 12, 2019, Plaintiff provided a Notice of Claims and Preservation Notice to Scott Hoye, Esq., General Counsel of DHHA, detailing her allegations, damages, and demands.

4.    On August 21, 2019, Plaintiff filed a Charge of Discrimination on behalf of herself and other similarly situated African American employees of DHHA with the U.S. Equal Employment Opportunity Commission (EEOC), alleging violations of Title VII and the ADA.

5.    On September 3, 2019, under the authority of 29 C.F.R. §1601.28, the EEOC (a) issued Plaintiff's Notice of Right to Sue after determining that it would not likely complete its investigation within 180 days; (b) ceased processing Plaintiff's charge; and (c) authorized this action in U.S. District Court. Exhibit A, EEOC Notice of Right to Sue.

6.    Plaintiff, on behalf of herself and other similarly situated African American female employees of DHHA, has fulfilled all conditions precedent to the initiation of this lawsuit.

## PARTIES

7.    At all relevant times, Plaintiff Carol Nichols has been a Colorado resident, residing at 7469 E. Ellsworth Avenue, Denver, Colorado 80230.

8.    Plaintiff is an African American woman born on November 8, 1956. Accordingly, Plaintiff falls within the classes of employees protected by Title VII, as well as the Age Discrimination in Employment Act of 1967, 29 U. S.C. 626(e).

9.    Plaintiff suffers from Leukemia, cancer of the blood, and from Non-Hodgkins Lymphoma, cancer of the immune system that develops from abnormal lymphocytes. As a result, Plaintiff is substantially limited in the major life activities and/or bodily functions of, *inter alia*, normal cell reproduction and immune system functionality. Plaintiff was/is, therefore, an "individual with a disability" within the meaning of Section 102(a) of the ADA, 42 U.S.C. §12112(1)(a); 29 C.F.R. §1630.2(g).

10.    As an Equal Employment Opportunity (EEO) Investigator, Plaintiff could perform the essential functions of her position with and/or without reasonable accommodation. Plaintiff is, therefore, a qualified individual with a disability within the meaning of 42 U.S.C. §12111(8) of the ADA.

11.    Defendant DHHA is a Colorado quasi-governmental entity established pursuant to §25-26-101, C.R.S. (2016) *et seq.,* primarily located at 777 Bannock Street, Denver, Colorado 80204. Defendant DHHA is a "safety net" hospital that provides health care services to Colorado patients.

12.    Defendant DHHA is an "employer" within the meaning of Section 701(b) of Title VII, 42 U.S.C. §2000e(b), and Section 101(5) of the ADA, 42 U.S.C. §12112(5).

## **GENERAL ALLEGATIONS**

13.    After decades of professional experience in the federal Equal Employment Opportunity (EEO) sector, DHHA Interim Chief Human Resources Officer Sherry Stevens hired Plaintiff as an EEO Investigator effective January 1, 2017.

14.    At the outset, Plaintiff observed a Human Resources (HR) department in turmoil, particularly with the abrupt departure of former DHHA Interim Chief HR Officer Tim Hansen in early January 2017.

15.    Plaintiff also discovered a sizable backlog of uninvestigated EEO complaints.

16.    Plaintiff resolved to complete as many investigations as she could, while maintaining professional standards for conducting EEO investigations.

17.    To this end, and with her supervisor's express consent, Plaintiff conducted most investigatory interviews via telephone to (a) increase investigative efficiency; and (b) avoid arousing suspicion and rumor among employees with her presence in the work units. Likewise, her then-supervisor, Interim Chief HR Officer, Sherry Stevens, permitted all HR employees to work from home one day per week so that they could catch up on reports and other activities requiring uninterrupted focus.

18.    Plaintiff soon observed that her superiors were not receptive to her findings or feedback of EEO violations/problems within DHHA's 7,000+ employee workforce.

19.    In April 2017, Plaintiff's physicians recommended a medical leave of absence out of concern that her acute work-related stress, anxiety, and panic attacks were compromising her leukemia treatment.

20.     When Plaintiff returned to work in June 2017, she discovered that DHHA had hired a new Chief HR Officer, Michelle Fournier-Johnson.

21.     In September 2017, Fournier-Johnson publicly chastised Plaintiff for making her former supervisor, Sherry Stevens, aware that another employee in the HR department wished to lodge an EEO complaint against Ms. Stevens, even though providing this notification was customary. Two weeks later, however, Fournier-Johnson reinforced the practice of giving HR leaders advance notice of any EEO complaints against them.

22.     Thereafter, in June 2018, Fournier-Johnson installed her former colleague, Sheila Paukert, as the Associate Chief Human Resources Officer over the EEO investigative function that Plaintiff performed. Both Fournier-Johnson and Paukert were very open about their prior professional and personal relationship.

23.     Plaintiff soon noticed examples of disparate treatment by Fournier-Johnson and Paukert. Paukert, in particular, often insulted or chastised Plaintiff in staff meetings, discounted her investigative findings, rejected her recommendations, and prevented Plaintiff from volunteering on internal DHHA committees or advancing her DHHA career.

24.     In fact, Fournier-Johnson and Paukert informally imposed a qualification of possession of a bachelor's degree in several job categories to discourage Plaintiff and other African American women from applying for promotions or other positions for which they were otherwise qualified.

25.     Fournier-Johnson and Paukert, however, "waived" this ostensible bachelor's degree requirement when hiring or promoting male and/or non-African American employees.

26.    This ostensible qualification standard—i.e. possession of a bachelor's degree--has an adverse impact on African Americans and Latinos who are otherwise qualified for a variety of positions by virtue of professional and/or military experience.

27.    This ostensible (and waivable) qualification standard is not job related and consistent with a business necessary for the vast majority of DHHA's HR, management, and/or leadership positions.

28.    From January 2018 until September 2018, Fournier-Johnson and Paukert actively discouraged Plaintiff from advancing her career at DHHA, even vacancies for which she was amply qualified in the HR department. In fact, Plaintiff had more varied and extensive leadership experience than most others in the HR department, including Paukert.

29.    From February 2018 until August 2018, for example, Paukert required Plaintiff to meet with her privately every other week. During these meetings, Paukert encouraged Plaintiff to seek employment elsewhere, expressed disappointment when Plaintiff turned down another job opportunity, chastised Plaintiff for seeking advancement at DHHA, and advised Plaintiff that her DHHA job prospects were limited.

30.    In May 2018, Plaintiff participated in an external investigation conducted by Sanders Investigations LLC regarding Paukert's treatment of African American female employees. As an African American female who has observed Paukert's treatment of herself and other African American women, Plaintiff offered a lengthy statement to Investigator Sanders dated May 17, 2018 in which she detailed Paukert's mistreatment. Plaintiff stated that she initially thought Paukert's mistreatment was limited to her but

realized that it extended to other African American women after several privately reported their disparate treatment concerns to her.

31.     In late July 2018, Paukert later appointed Jill Damman (Caucasian female) as Plaintiff's direct supervisor. Even though Plaintiff had substantially more EEO experience than Damman and had previously expressed interest in Damman's position, Paukert discouraged her from applying. Worse, Paukert expressed displeasure with Plaintiff when she actually applied for the position and criticized DHHA's recruiter for allowing Plaintiff to apply. Upon information and belief, Paukert preselected Damman for the position before the vacancy announcement lapsed.

32.     In August 2018, Paukert attended the HR Employee Relations team staff meeting and yelled at Plaintiff for recommending "investigative leave" for an alleged harasser after a credible report of sexual harassment.

33.     At the next staff meeting in August 2018, Paukert publicly berated Plaintiff for recommending that DHHA's managers engage in the "interactive process" after an employee requested a "reasonable accommodation" for a permanent disability, as legally required under the ADA.

34.     After this incident, several of Plaintiff's coworkers visited her office to express support and disbelief about Paukert's abusive public treatment of her.

35.     Likewise, in August 2018, Plaintiff requested permission from Paukert to volunteer on a Diversity and Inclusion project with Christina Gregoire (African American female) for the good of DHHA. Paukert denied Plaintiff's request on the ground that Plaintiff volunteered too much at DHHA and had too much work. Paukert later rebuked Gregoire

for allegedly attempting to pass off her [Gregoire's] work assignments to other HR employees like Plaintiff. Paukert, however, publicly praised former HR employee Dana Turner (Caucasian female) for volunteering for extra assignments.

36.    In September 2018, Plaintiff participated in a follow-up external investigation about Paukert's treatment of African American women in which she, again, provided truthful, and damning, feedback about her experiences and observations of Paukert.

37.    In October 2018, Plaintiff's physicians again requested that Plaintiff take a medical leave from DHHA, believing that the stress, anxiety, and panic that Plaintiff was experiencing at work was interfering with the effectiveness of her chemotherapy treatments. This stress also caused Plaintiff to undergo a "cardiac ablation" in October 2018 for supraventricular tachycardia, a condition that had been under control for several years.

38.    Despite Paukert's acrimony toward Plaintiff, Plaintiff and Damman forged a close-knit working relationship. On several occasions, Plaintiff advised Damman that, in addition to evidence uncovered during her EEO investigations, several African American women had sought out her counsel about their perceptions of race and/or gender discrimination within their respective departments.

39.    In April 2019, Plaintiff's physicians performed a "CAR-T stem cell" procedure in lieu of another bone marrow transplant to stop the progression of her leukemia. While on Short Term Disability (STD), Plaintiff advised her direct supervisor, Damman, that the side effects of this treatment could be serious, even life threatening. Plaintiff underscored forgetfulness and confusion are common side effects, commonly known as "chemo brain."

40.    On June 19, 2019, after her return to work, Plaintiff requested the reasonable accommodation of being able to work from home a couple days per week. Plaintiff's physicians recommended this reasonable accommodation in writing to protect her from airborne viruses common in a hospital environment while her immune system remained compromised during chemotherapy. Plaintiff realized the danger to herself when two coworkers sneezed in her office, announcing that they had viruses. Further, Plaintiff had begun to experience some chemotherapy-related confusion when multitasking in a work environment teeming with interruptions, conditions she could mitigate in her home office.

41.    During her employment, Plaintiff observed that Fournier-Johnson and Paukert permitted numerous other employees in the HR department to work from home. Plaintiff explained that she could continue to investigate DHHA's internal EEO complaints from home, given that she and her counterpart, Vanessa Vargas (Latina) already conducted most of interviews via telephone.

42.    On Thursday, June 20, 2019, Pat Tillapaugh notified Plaintiff that "they" (i.e. Paukert and Damman) had denied her reasonable accommodation request, but she was provided no explanation regarding why. At no time did Paukert or Damman engage in the "interactive process" in response to her reasonable accommodation request, as required by DHHA policy and longstanding practice.

43.    On Friday, June 21, 2019, Damman asked to meet with Plaintiff in order to, Plaintiff presumed, engage in the "interactive process" as the appropriate legal response to her reasonable accommodation request on June 19, 2019.

44.    Instead, Damman advised Plaintiff that she was terminating her employment on
orders from Paukert. According to Damman, Paukert blamed Plaintiff for "destroying" the
"credibility" of the entire HR department, when Plaintiff claimed to have interviewed an
investigative witness that she had not, in fact, interviewed—i.e. an honest memory lapse
that Plaintiff attributed to "chemo brain." Plaintiff repeatedly offered to explain and correct
her mistake, reminding Damman of their extensive conversations about the short-term
memory loss and confusion associated with chemotherapy.

45.    Plaintiff asked why Damman and Paukert had not invoked or activated DHHA's
performance rehabilitation policies and practices in her case, HR policies and practices
that she trained other DHHA managers to follow. Damman stated that she did not know,
reinforcing that she did not make the termination decision. Instead, Damman insisted that
Plaintiff's correctable memory lapse was so "egregious" that it warranted suspension of
its progressive disciplinary and rehabilitation policies and as a result, immediate
termination. Damman cried throughout the two-hour long meeting in which DHHA
terminated Plaintiff's employment, placing Plaintiff in the uncomfortable position of
comforting the individual [Damman] who had just stripped Plaintiff of her livelihood, health
insurance, and ability to care for the young grandchildren placed in her custody.

46.     Upon information and belief, after terminating Plaintiff, Damman requested and
received a short medical leave of absence for mental health-related reasons.

47.    On June 28, 2019, seven days after carrying out Paukert's termination decision,
Damman documented "overall job performance" as the reason for termination, citing only

the incident in which Plaintiff had forgotten whether or not she contacted an investigative witness.

48.    In Plaintiff's most recent job performance evaluation administered just three months earlier in March 2019, Damman rated Plaintiff's performance as "Successful", noting

> Carol's team members have a tremendous amount of respect and appreciation for Carol. She approaches her role with kindness and respect. She provides helpful and insightful feedback and recommendations to the team. At times she has struggled to meet deadlines, but she has made adjustments and I anticipate continued Improvement in this area. I encourage carol to continue to grow and develop in areas that will help promote personal job satisfaction. Carol's extensive experience within human resources makes her a valuable resource to the team. I look forward to working with Carol In the coming year.

49.    DHHA—particularly Paukert, Damman, and Fournier-Johnson—have treated non-disabled employees outside of Plaintiff's protected racial, gender, and age groups—more favorably in terms of reasonable accommodations, requests to work from home, promotional opportunities and career advancement, mentoring, civility, and other essential terms and conditions of employment.

### Count I:
### Unlawful Disparate Treatment Discrimination under Title VII

50.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

51.    As an African American woman, Plaintiff is a member of the classes protected under Title VII, 42 U.S.C. §2000e-2(a)(1).

52.    At the time of her termination for "overall job performance," Plaintiff's most recent performance appraisal in March 2019 rated her as "Successful," even engendering the respect of the HR department.

53.    DHHA terminated Plaintiff's employment without engaging in its customary job performance rehabilitation process, as set forth in its Employee Counseling/Accountability-Based Performance Policy, No. 3200118, that was in effect throughout Plaintiff's employment. Exhibit B, DHHA Employee Counseling/Accountability-Based Performance Policy.

54.    DHHA's stated reason for termination—e.g. "overall job performance" and "destroying" "credibility"—is a pretext to mask discriminatory animus and overt disparate treatment.

55.    In terminating Plaintiff's employment for a minor memory lapse, DHHA treated similarly situated comparators in its HR department more favorably. As an EEO Investigator, Plaintiff is aware of approximately a dozen employees in leadership positions who made much larger and more "egregious" errors than Plaintiff and retained their positions upon advice from DHHA's HR Employee Relations team. In fact, the employee whom Plaintiff had forgotten to interview (Caucasian male) committed more "egregious" errors and violations but retained his position.

56.    In refusing to permit Plaintiff to fulfill her job functions from home temporarily for a couple of days per week, DHHA treated similarly situated comparators in its HR department more favorably.

55.    By discouraging Plaintiff and other African American women from seeking promotional and/or volunteer opportunities, DHHA treated similarly situated comparators in its HR department more favorably.

56.    DHHA acted intentionally, with malice and/or with reckless indifference to Plaintiff's rights.

57.    As a direct and proximate consequence of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to backpay, frontpay, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, professional disparagement, other nonpecuniary losses, and any other equitable and non-equitable relief authorized by the Civil Rights Act of 1991, 42 U.S.C. §1981a(b), *including* attorneys' fees.

### Count II: Race Discrimination in Violation of 42 U.S.C. §1981

58.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

59.    As an African American woman, Plaintiff is a member of the classes protected by 42 U.S.C. §1981.

60.    At the time of her termination for "overall job performance," Plaintiff's most recent performance appraisal in March 2019 rated her as "Successful," even engendering the respect of the HR department.

61.    DHHA terminated Plaintiff's employment without engaging in its customary job performance rehabilitation process, as set forth in its Employee

Counseling/Accountability-Based Performance Policy, No. 3200118, that was in effect throughout Plaintiff's employment. Exhibit B, DHHA Employee Counseling/Accountability-Based Performance Policy.

62.    DHHA's stated reason for termination—e.g. "overall job performance" and "destroying" "credibility"—is a pretext to mask discriminatory animus and overt disparate treatment.

63.    In terminating Plaintiff's employment for a minor memory lapse, DHHA treated similarly situated comparators in its HR department more favorably.

64.    In refusing to permit Plaintiff to fulfill her job functions from home temporarily for a couple of days per week, DHHA treated similarly situated comparators in its HR department more favorably.

65.    By discouraging Plaintiff and other African American women from seeking promotional and/or volunteer opportunities, DHHA treated similarly situated comparators in its HR department more favorably.

66.    DHHA acted intentionally, with malice and/or with reckless indifference to Plaintiff's rights.

67.    As a direct and proximate consequence of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to backpay, frontpay, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, professional disparagement, other nonpecuniary losses, and any other equitable and non-equitable

relief authorized by the Civil Rights Act of 1991, 42 U.S.C. §1981a(b), including attorneys'
fees.

**Count III: Unlawful Disparate Impact Discrimination under Title VII**

68.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this
Complaint as though set forth herein in full.

69.    DHHA imposed an allegedly non-waivable qualification standard of possession of
a bachelor's degree for employment or advancement in its HR department.

70.    DHHA waived this ostensible qualification standard in its sole discretion and
applied this waiver inequitably.

71.    This ostensible qualification standard had, and continues to have, a statistically
significant adverse impact on African American applicants and employees seeking
employment and/or career advancement.

72.    This ostensible qualification standard is neither job-related nor consistent with a
business necessity, given that several successful incumbents lack this allegedly
necessary credential.

73.    Because of this unnecessarily rigid qualification standard imposed by Paukert and
Fournier-Johnson, Plaintiff and other African American women were actively discouraged
and prevented for applying for positions for which they were otherwise qualified.

74.     Because of the disparate impact of this ostensible qualification standard, Plaintiff
and other African American women have suffered damages in amounts to be proven at
trial.

**Count IV: Unlawful Retaliation Under Title VII**

75.     Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

76.     In May 2018 and September 2018, Plaintiff participated in an external investigation re Paukert's treatment of African American women in which she candidly shared, in writing, her observations and assessments of Paukert as an HR leader charged with organizational EEO compliance. Upon information and belief, Paukert read these critical written reports, considering that she intensified her public mistreatment of Plaintiff thereafter.

77.     Likewise, in the month preceding her termination, May 2019, Plaintiff regularly updated and conversed with her new direct supervisor, Damman, about Paukert's mistreatment not only of herself but also other African American women who shared their perceptions of discrimination with her.

78.     Because of these and other legally protected activities to voice concerns about Paukert's and Fournier-Johnson's mistreatment of African American women—i.e. herself and others at DHHA--DHHA terminated her employment.

79.     DHHA's stated reason for termination—i.e. overall job performance—is a pretext to mask retaliatory intent, in light of, *inter alia*, DHHA's failure to follow its own published performance rehabilitation policies in carrying out her termination, her most recent performance appraisal by Damman characterizing her job performance as "successful", and the comparatively minor nature of the incident for which DHHA terminated her.

80.    DHHA acted intentionally, with malice and/or with reckless indifference to Plaintiff's rights.

81.    As a direct and proximate consequence of DHHA's unlawful retaliation, Plaintiff has suffered and continues to suffer compensatory pecuniary and non-pecuniary damages, including but not limited to backpay, frontpay, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, professional disparagement, other nonpecuniary losses, and any other equitable and non-equitable relief authorized by the Civil Rights Act of 1991, 42 U.S.C. §1981a(b), including attorneys' fees.

## Count V: Unlawful Failure to Accommodate in Violation Section 102(b)(5) of the ADA, 42 U.S.C. §12112(b)(5)

82.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

83.    Plaintiff suffers from leukemia, a type of blood cancer that substantially limits her in the major life activities of, *inter alia*, normal cell reproduction and immunological functioning, particularly while in chemotherapy. Plaintiff also suffers from lymphoma, cancer of the leukocytes, which compromises her immune system and leaves her vulnerable to viruses and infection. Despite her disabilities, Plaintiff could, and did, perform the essential functions of her EEO Investigator position with <u>and</u> without reasonable accommodation.

84.     On June 19, 2019, Plaintiff and her physicians requested the reasonable accommodation of being able to work from home two days per week on a temporary basis—i.e. while undergoing chemotherapy that compromised her immune system.

85.     Instead of engaging in the "interactive process" toward formulating a reasonable accommodation, DHHA ignored her request and instead, terminated her employment.

86.     Throughout her employment, Plaintiff routinely conducted interviews via telephone, a fact known to Stevens, Paukert, and Damman. Further, Plaintiff observed other members at, below, or above her level in DHHA's HR department who routinely worked from home one or two days per week. Plaintiff's request was, therefore, not only "reasonable" but also feasible without posing an undue hardship upon DHHA.

87.     DHHA's stated reason for termination—i.e. overall job performance—is a pretext to mask its unwillingness to provide the reasonable accommodation to which Plaintiff was legally entitled.

88.     Because DHHA terminated Plaintiff instead of providing the requested reasonable accommodation to which she was legally entitled, Plaintiff lost her livelihood and health insurance when she needed them most. Plaintiff suffered, and therefore requests, remedies available under Title I of the ADA, 42 U.S.C. §12117(a), including but not limited to backpay, frontpay, attorneys' fees, compensatory damages, and costs.

### **Count VI: Unlawful Termination in Violation Section 102(b)(1) of the ADA, 42 U.S.C. §12112(b)(1)**

89.     Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

90.    By terminating Plaintiff's employment instead of engaging in the "interactive process" following her request for reasonable accommodation for a known disability, DHHA violated Section 102(d)(1) of the ADA, 42 U.S.C. §12112(b)(1), which prohibits employers from terminating otherwise qualified individuals with disabilities because of their disabilities.

91.    Plaintiff's request to work from home two days per week while undergoing chemotherapy was not only "reasonable" but also feasible without posing an undue hardship upon DHHA, given that DHHA routinely permitted HR staff and managers to work from home.

92.    DHHA's stated reason for termination—overall job performance—is a pretext to mask DHHA's unwillingness to grant Plaintiff the protections and accommodations available to her under the ADA.

93.    Because DHHA terminated Plaintiff instead of providing the requested reasonable accommodation to which she was legally entitled, Plaintiff lost her livelihood and health insurance when she needed them most. Plaintiff suffered, and therefore requests remedies available under Title I of the ADA, 42 U.S.C. §12117(a), including but not limited to backpay, frontpay, attorneys' fees, compensatory damages, and costs.

### Count VII: Unlawful Retaliation Under the ADA, 42 U.S.C. §12203(a)

94.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

19

95.    On June 19, 2019, Plaintiff engaged in the protected activity of requesting a reasonable accommodation under the ADA—i.e. the ability to work from home two days per week while undergoing chemotherapy.

96.    On June 20, 2019, Paukert and Damman denied Plaintiff's reasonable accommodation request summarily, without providing an explanation.

97.    The next day, on June 21, 2019, DHHA terminated Plaintiff's employment instead of responding to her reasonable accommodation request or otherwise engaging her in the "interactive process."

98.    DHHA's stated reason for termination—overall job performance—is a pretext to mask retaliatory animus for Plaintiff's exercise of her ADA rights.

99.    By terminating Plaintiff because she requested a reasonable accommodation to which she was entitled, DHHA has violated §42 U.S.C. 12223(a) of the ADA.

100.    Because DHHA terminated Plaintiff because she requested a reasonable accommodation to which she was legally entitled, Plaintiff lost her livelihood and health insurance when she needed them most. Plaintiff suffered, and therefore requests remedies available under Title I of the ADA, 42 U.S.C. §12117(a), including but not limited to backpay, frontpay, attorneys' fees, compensatory damages, and costs.

## Count VIII: Promissory Estoppel

101.    Plaintiff incorporates by reference the allegations made in prior paragraphs of this Complaint as though set forth herein in full.

102.    As an EEO Investigator, Plaintiff's job duties involved acquainting managers and employees with DHHA employment policies like PolicyStat 3200118, Employee

Counseling/Accountability-Based Performance, in effect from January 2017 until January 2021. Plaintiff was, therefore, aware of this policy and relied on it as a term and condition of her employment.

103.    This policy requires, *inter alia*, DHHA managers to employ a rehabilitative progression that begins with counseling, proceeds to written discipline, and ends with termination.

104.    DHHA maintains its employment policies separately, with no generally applicable disclaimer binding them together.

105.    DHHA intended that managers adhere to this policy when administering discipline or attempting to rehabilitate job performance. Accordingly, DHHA expected its workforce, both managers and employees, to rely on this published policy as a term and condition of employment.

106.    In terminating Plaintiff's employment for "overall job performance" without invoking *any* of the steps set forth in this policy, DHHA breached its written agreement to utilize a progressive disciplinary and rehabilitative process for non-serious infractions prior to termination.

107.    As a direct result of Plaintiff's detrimental reliance on DHHA's published policies, Plaintiff has suffered and continues to suffer damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff seeks a jury trial and judgment against on all triable claims asserted against them, respectively, in amounts to be determined at trial, including all remedies authorized by Title VII, 42 U.S.C. §1981, §42

U.S.C. §1981a, the ADA such as backpay, frontpay, pecuniary and non-pecuniary compensatory damages, costs, and attorneys' fees; all remedies in authorized in any Colorado common or statutory law; pre- and post-judgment interest; and any other equitable or monetary relief that this Court deems just and proper.

Respectfully submitted this 2nd day of October 2019.

s/ Merrily S. Archer
Merrily S. Archer, Esq., M.S.W.
EEO Legal Solutions LLC

Attorney for Carol Nichols *et al.*
600 17th Street, Suite 2800-S
Denver, Colorado 80202
(303) 248-3769 (direct)
(303) 915-5486 (text/cell)
archerm@eeolegalsolutions.com
www.eeolegalsolutions.com