IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02818-DDD-KLM

CAROL NICHOLS, on behalf of herself and
similarly situated employees,
Plaintiff(s),
v.
DENVER HEALTH AND HOSPITAL
AUTHORITY,
Defendant.

---

## ORDER ON PENDING DISCOVERY MOTIONS

---

ENTERED BY SPECIAL MASTER JANE G. EBISCH, ESQ.

This matter is before the Master pursuant to the Order Appointing Master for Discovery dated August 11, 2020 [#74].  The Clerk referred the following motions to the Master:

(1) Defendant's Motion for Sanctions [#53], and

(2) Plaintiff's Renewed Motion to Compel and Challenge to Defendant's Belated

Claim of Attorney/Client Privilege [#55].

The Special Master has reviewed the briefing for each of the pending motions as well as the applicable case law and has considered the entire docket, including the deposition transcripts, the exhibits and the transcript of the informal discovery dispute conference.  Oral argument would not materially assist in the resolution of these motions.  For the following reasons, the Special Master GRANTS Defendant Denver Health and Hospital Authority's ("DHHA's or Defendant's") Motion for Sanctions, and the Special Master hereby DENIES Plaintiff's Renewed Motion to Compel and Challenge to Defendant's Belated Claim of Attorney/Client Privilege, with leave to amend the discovery requests for discovery concerning Sheila Paukert.

I.    **BACKGROUND**

Plaintiff Carol Nichols ("Ms. Nichols or Plaintiff") initiated this action by filing a

Complaint and Jury Demand in the United States District Court, District of Colorado, on October

2, 2019.  The Complaint alleges that Plaintiff was illegally terminated on June 21, 2019 from her

position as an EEO investigator employed by Defendant.  Plaintiff alleges several claims against

DHHA in her Complaint, including race discrimination, violation of the Americans with

Disabilities Act, and retaliation.  DHHA contends that Plaintiff was properly terminated after she

claimed several times, without a factual basis, that she had interviewed an investigative witness

that she had not, in fact, interviewed.

II.  **DEFENDANT'S MOTION FOR SANCTIONS**

A.  Background

In the Motion for Sanctions filed by DHHA, Defendant charges Ms. Nichols' counsel,

Merrily Archer ("Ms. Archer or Attorney Archer") with inappropriate and unprofessional

conduct at the deposition of Defendant's key witness, Jill Damman.  Ms. Damman was Ms.

Nichols' supervisor at DHHA, and was allegedly responsible for making and carrying out the

decision to terminate Ms. Nichols' employment.

Specifically, Defendant accuses Attorney Archer of the following misconduct:  1)

insulting Ms. Damman's intelligence; 2) accusing Ms. Damman of lying, and 3) making Ms.

Damman's mental health a centerpiece of trial.  Motion, #53 at 1-2.  Defendant requests that

sanctions be imposed against Ms. Archer for her conduct during the deposition of Ms. Damman,

and asks that Ms. Archer be ordered to pay Defendant's attorney's fees and costs for filing the

motion and for the costs associated with defending Ms. Damman's deposition.

Attorney Archer does not specifically deny the allegations against her. She claims that her deposition style resulted in eliciting the responses she was looking for. ". . . [C]onfronting Ms. Damman on her false statements and deliberate withholding of information in response to direct questions (i.e. mendacity) thereafter facilitated the flow of truthful information." Plaintiff's Response, #62 at 11. Plaintiff's counsel claims that "depositions of responsible decision-makers and HR officials are characteristically highly charged" and that she had to use these techniques to counter Ms. Damman's "evasiveness, prevarication and hedging." Plaintiff's Response, #62 at 5. Counsel claims that if the deposition was abusive, defense counsel would have and should have stopped it in accordance with Fed.R.Civ.P. 30(d)(3)(A). She also notes, in her defense, that Ms. Damman "showed no outward signs of distress (e.g. crying, anger) . . ." during the deposition. Plaintiff's Response, #62 at 6.

The Special Master has reviewed the transcript of Ms. Damman's deposition, the motion, response and reply. Given the evidence presented, the Special Master finds that Plaintiff's counsel acted in violation of Fed.R.Civ.P. 30(c)(1) by failing to conduct her examination of the deponent in the same manner, and with the same level of decorum as would be required in a courtroom. The evidence shows that throughout the deposition, Ms. Archer repeatedly attacked Ms. Damman's truthfulness and credibility. As set forth more fully below, Ms. Archer's excessive, harassing and belittling comments were undertaken in bad faith to embarrass and oppress the deponent in violation of D.C.COLO.LCivR 30.3(a). At several points in the deposition, counsel for DHHA politely objected to Ms. Archer's tone. He repeatedly requested, to no end, that Ms. Archer stop insulting the deponent. No rule requires defense counsel to stop the deposition as a prerequisite for seeking sanctions later.

Ms. Archer contends that defense counsel's defense of Ms. Damman's deposition violated Fed.R.Civ.P. 30(d)(2)(A) and D.C. COLOLCivR.30.3(a) because, among other things, he objected 181 times during the depositions.  Plaintiff does not seek cross-sanctions against defense counsel for his deposition conduct.  The Special Master has considered the allegations against defense counsel when reading through the transcript of the deposition of Ms. Damman, and found that defense counsel's objections were appropriate, short and simply-stated.  They do not constitute a basis to excuse Ms. Archer's inappropriate questioning of the witness.

     1. Fed.R.Civ.P. 30

Fed.R.Civ.P. 30(c)(1) requires that ". . . [t]he examination and cross-examination of a deponent proceeds as they would at trial . . .."  In addition, Fed.R.Civ.P. 30(d)(2) allows the Court to "impose an appropriate sanction–including the reasonable expenses and attorney's fees incurred by any party–on a person who impedes, delays, or frustrates the fair examination of the deponent." Generally, this rule is used when someone is accused of interrupting the deposition. *See, e.g., Layne Christensen Co. v. Bro–Tech Corp.*, No. 09–2381–JWL–GLR, 2011 WL 4688836, at *8 (D.Kan. Oct. 6, 2011) (applying Fed.R.Civ.P. 30(d)(2) to counsel who violated Fed.R.Civ.P. 30(c)(2) by directing the deponent not to answer); *Deville v. Givaudan Fragrances Corp.*, 419Fed.Appx. 201, 209 (3d Cir.2011) (affirming magistrate judge's imposition of sanctions pursuant to Fed.R.Civ.P. 30(d)(2) upon finding that attorney "testified on behalf of her witness by way of suggestive speaking objections"); *Craig v. St. Anthony's Medical Ctr.*, 384 Fed.Appx. 531, 533 (8th Cir.2010) (affirming district judge's award of sanctions pursuant to Fed.R.Civ.P. 30(d)(2) due to "a substantial number of argumentative objections together with suggestive objections and directions to the deponent to refrain from answering questions without asserting a valid justification" pursuant to Fed.R.Civ.P. 30(c)(2)). Nothing in the rule limits its

application to defense counsel's conduct.  The imposition of sanctions under Rule 30(d)(2) requires the movant to identify language or behavior that impeded, delayed, or frustrated the fair examination of the deponent. *See* Fed.R.Civ.P. 30(d)(2). When making this inquiry, the court will look to: (1) the specific language used (e.g., use of offensive words or inappropriate tones); (2) the conduct of the parties (e.g., excessive objections or speaking objections); and (3) the length of the deposition. Second, the movant must identify "an appropriate sanction." *Id.  Dunn v. Wal–Mart Stores, Inc.*, 2013 WL 5940099, at *5 (D.Nev. 2013).

Here, Defendant offers citation to many portions of the deposition of Ms. Damman in support of its argument that Ms. Archer's behavior was improper and that she engaged in personal attacks against the deponent.  Motion, #53 at 4-7.   The Special Master has reviewed the deposition transcript in its entirety [#53-1] and concludes that Ms. Archer's behavior was offensive and inappropriate.  Ms. Archer's inability to recognize or acknowledge her unprofessional and unacceptable behavior in the deposition underscores the need for an appropriate sanction.  The Special Master therefore orders that she personally be assessed attorney's fees and costs for the defense of Ms. Damman's deposition, for defense counsel's time and expense in preparing the Motion for Sanctions, and the Reply, and for the Special Master's time in addressing the Motion for Sanctions.

2.   Deposition Conduct Justifying the Imposition of Sanctions

It is worth noting that Ms. Archer began the deposition with a personal attack on opposing counsel:

> Q. (Mr. Hudgens (defense counsel)) [Making an objection relating to the fact that the deposition was not noticed by Plaintiff for video recording, despite the fact that it was, in fact, being videotaped] You can proceed, Ms. Archer.  Thank you.

A.  (by Ms. Archer) . . . Mr. Hudgens, are you going to continue to have impulse control problems throughout this deposition or are you going to let me continue with my examination?

Q. No, Ms. Archer.  As I indicated, I was making one objection for the record.  You can continue.

A.  Time will tell.

Damman Depo., #53-1:  6: 14-23.

Ms. Archer gratuitously accused the deponent of lying, when the deponent was simply answering her questions.  Damman Depo., #53-1: 132:2-23, 134:13-15.   When Ms. Damman testified about a typing error on the date of her notes, Ms. Archer relentlessly badgered Ms. Damman:

Q. (by Ms. Archer):  . . . It [her notes] says "Carol confirmed that she spoke with him 8-10."  Does that date look right to you?

A.  (by Ms. Damman):  No.  I – I think that I intended to write 6-10 because this was written in June.

Q. Yeah.  Because you fired Carol on June 21st, 2019, right, and then – so you say, "Carol confirmed that she spoke with him 8-10."  When did you make these notes?

A.  So again, I – I can't provide the exact day, time, that – that it would have been, either – it would – my typical practice was to capture notes same day or within a couple of days.

Q.  How do you account for a mistake like that?

A.  I – that was a mis – that was a miskeying on my part.

Q.  . . . So you actually recorded a date two months – that that was off by two months.  Were you trying to falsify your notes?

[Objection from defense counsel]

Q. (by Ms. Archer):  . . . [Y]ou know what, this is what – hold on, Ben.  This is about someone making an irrational attribution, as we're going to talk about in a second, that she's dishonest.  And we have an HR professional who's already lied to me three times in this deposition that I can verify, and now I'm asking her if she made a mistake in her notes, and I'm trying to figure out what could we possibly attribute such a sloppy error to.

So Ms. Damman, you wrote that it was actually . . . she thought it was August 10th.  So you're off by two months.  Were you trying to make a false record of – out of your notes?

A.  No.

Q.  Were you lying?

A.  No.

Q.  How do I know you're not lying?  You wrote this down.  . . . Why would you make false notes like that?

A.  I made a mistake in typing these up.  It was a – it was a keying error.

Q.  So you made a mis – you made a mistake twice in typing out notes –

A.  Yes.

Q.  – that – that you used as the basis to make a decision to strip an African American woman with cancer of her health insurance and her livelihood.  Okay.  That's awesome.  All right.  Did you rely on this false ---

. . . .

Q.  Do you want me to give you the benefit of the doubt that you just made a simple mistake?

A.  Oh, I'm – I'm telling you that I – that I made a mistake in those dates.

Damman Depo., #53-1: 157:4 – 160:2.

Throughout the remainder of the deposition, Ms. Archer repeatedly accused the deponent of lying.  *See, e.g.* Damman Depo., #53-1: 172:17 – 173:10 (". . . I just can't let witnesses filibuster like this, especially since I already know that they're going to be dishonest. . .."); 239:5-7 (after Ms. Damman answered a question and stated simply that June 21 was the date that Plaintiff's termination was processed, Ms. Archer stated, "Good.  How hard was that? Sometimes the truth leaks out of you, Ms. Damman"); 248:25 – 249:13 (". . . See, this is the

thing, is that you don't -- you don't want to tell the truth, so we need to go back to your notes. . ..").

Ms. Archer demonstrated oppression of the witness by asking the witness a question, and then refusing to let her answer.  *See e.g.* Damman Depo., #53-1: 174:5–175:3:

A.    [Deponent answering a question about how she determines that someone is credible, deponent begins to answer] Well, I would always want to . . . base a decision on facts --

Q.    And if the fact is – is that prior –

A.    -- and –

Q.    -- to your conversation –

A.    -- so –

Q.    The fact is, prior to your conversation – you're interrupting me.  The fact is, prior to your conversation –

Defense counsel:  Ms. Archer, you're interrupting the witness.

Ms. Archer:  No. No. No.

Defense counsel:  Ms. Archer.

Ms. Archer:  No. No. No.  You're going to –

Defense counsel:  Ms. Archer.

Ms. Archer:  Stop it.  Mute your mic.

. . .

Ms. Archer:  I'm going to get a question in.  No.  . . . I will ask my question.

Most disturbing of all in this deposition was the nastiness and cruelty which Ms. Archer heaped on the deponent.  No such behavior would be allowed in any Colorado state or federal court.  Examples abound in the deposition, including the following:

Q. . . . On the bottom, I see some writing.  Is that your handwriting?

A.  Everything on this page is my handwriting.

Q.  Perfect.  I see this word at the bottom, A-G-G-R-E-G-E-O-U-S.  What is that word?

A.  Well … one of the reasons that I don't like to do handwritten notes is that, as this is demonstrating, I'm a terrible speller.  That was me writing the word egregious.

Q.  I see.  You know, given your background in psychology, you may or may not know this, but people typically do not use words they can't spell.  Is "egregious" a common word in your vocabulary, since apparently you don't know how to spell it?
. . .

A.  It is a word that I use.

*See* Damman Depo., #53-1: 217:7-24.

The following exchange is a typical example of how Plaintiff's counsel's personal

emotions and animus against the defense took over her obligation to act professionally and

respectfully:

Q.  What kind of a person do you think would attack the credibility of a woman who had just returned to work three weeks ago, and who had admitted she was confused sometimes on the job, which is why in part she had requested an accommodation?

Defense counsel:  Object to form.

A.  Carol used the term "brain fog" once.

Q. No, I –

A. And in reference –

Q. – you're not answering my question again.  So we're going as to stop you – your filibuster.  Okay?

A.  I really am trying to answer your questions to the best of my ability.

Q.  I don't – I can – I have incompetence or malice, and I can't really figure – I think a little of both are going on here.

Defense counsel:  Ms. Archer, I'm going to ask you not to insult my client on the record, please.

Q.  What kind of person would attack the credibility of a cancer patient who had just returned to work?

Defense counsel:  Object to form.

A.   Over the course of several days, Carol had reported to me that she had spoken with [redacted person's name] and that she also had witness testimony confirming –

Q.  You're not answering my question.  So, you know, that's what I'm trying to get to, is that the – the lawsuit that we're going to be filing against you is called tortious interference with an employment contract, which means that you acted based on personal animus and without any legitimate business justification.  And so that's the complaint, based on your testimony, that I think we can pursue against you based on what you said today because I'm trying to figure out – you know, Carol liked you, but even though she had – had returned to work and had had cancer, obviously, you harbored a very low opinion of her credibility.

Defense counsel:  Ms. Archer do you have a question for my witness?

Q.  Yes, I do.  I do because this is based on -- . . . I have to say, I have a master's degree in clinical social work, and when I see someone making such harmful and ridiculous attributions, you know like calling a cancer patient a liar, I not only have mental health concerns about you, Ms. Damman, I have some serious concerns about whether or not you're even competent to be in the role you're in.
. . . .

Q.  I guess you're the kind of person that would fire a cancer patient who told you –

Defense counsel:  Ms. Archer – Ms. Archer –

Q.  – that –

Defense counsel:  -- let me be – Ms. Archer, let me be clear . . .. If you would like to insult me, you are more than welcome to insult me.

Ms. Archer:  No, I –

Defense counsel:  I would ask that you not insult my client.

Ms. Archer: . . . This is an employment deposition.  She is the decision maker.  In employment litigation, Ms. Damman is what we call the villain who's going to be facing a charge herself because of her personal animus against my client.

Damman Depo., #53-1: 231:24-235:5.

Ms. Archer used the deposition to threaten and intimidate the deponent many times over.

For instance:

> A.  [In response to a question about deponent's decision to terminate plaintiff's employment] I stand by the reason for termination and the document that is in front of us summarizes the reason for termination.

> Q.  And that is why you're going to be facing a tortious interference and defamation claim . . ..

Damman Depo., #53-1: 262:17-22. And in another instance, Attorney Archer questioned

as follows:

> Q.  Ms. Damman, what is your mailing address?

> A.  At Denver Health?

> Q.  Well, is that where you would like to be served a summons or would you like to be served a summons at home?

> . . . .

> Q.  . . . [I]t might be important for you to at least talk to your own attorney, and I feel strongly that you should still do that.  As a member of the bar, I think it's ethical to advise people to consult with an attorney . . . I actually think we have more compelling evidence than we would have had with Mr. Hansen to bring this claim against you . . ..  I have long been concerned about whether or not you're getting proper and high-quality legal advice about not only your own exposure but Denver Health's in this litigation . . ..

Damman Depo., #53-1: 284:2-285:12.

Ms. Archer's commentary on the deponent's testimony throughout the deposition

was, at best unprofessional, and interjected to embarrass and harass the deponent.  The following

comment after the witness attempted to answer her question is a perfect example:

> Q.  How long did you [and Sheila Paukert] work together at Fresenius?

> A.  Oh, I can tell you how long I worked there.  I worked . . . and I'm saying it this way because I don't know what Sheila's exact dates of employment were.  So, I can only answer for my dates of employment there. . ..  And I was there for approximately five years.

Q.  I asked you, how long did you work together?  And you're telling me how to build a radio. . ..

Damman Depo., #53-1: 264:4-14.

The final straw occurred at the end of Ms. Damman's deposition, when Ms. Archer touted her own background as the foundation to "diagnose" the deponent with a "mental health or personality disorder," over the objection of defense counsel.  The following exchange, where Ms. Archer is plainly frustrated that she has not been able to back the witness into the box that fits Ms. Archer's view of the case, is an illustration of deposition "questioning" that is oppressive, harassing and embarrassing.  The following exchange, especially Ms. Archer's insulting inference that the deponent suffered from a mental condition, would not be tolerated in a courtroom:

Q.  And . . . even though we look at your own notes that show that she did bring this to your attention before you announced the termination decision, you still continue to deny it.  I find that fascinating.  Is there any reason why you would have any memory problems?

A.  No.

Q.  Are you taking any medication that would interfere with your memory?

A.  No.

Q.  Are you undergoing any treatment that would interfere with your memory?

A.  No.

Q.  Have you ever been diagnosed with a mental health or personality disorder?

Defense counsel:  I will object to the extent that Ms. Damman's health and well-being and mental health is not at issue in this litigation. . .. [defense counsel ultimately instructs the witness not to answer or respond with respect to any mental health conditions which are outside the scope of the deposition]

[Further argument between counsel about bringing this issue to Magistrate Judge Mix].

Q.  Mr. Hudgens, one of us has a master's degree in clinical social work from one of the top programs in the country, and it isn't you.  And so the fact that I am bringing this out I think is directly relevant, even though it might be well outside your wheelhouse.  So just because you're not familiar with it, because of the Dunning-Kruger bias, does not mean that the attributions Ms. Damman makes about employees' intent and employees' character and the bias that her judgment shows, that is absolutely relevant to these proceedings, and will be not only addressed before the magistrate, I'm considering a Rule 35 exam and that we will make this a centerpiece of . . . our presentation at trial.  So again, just because you might not be familiar with the psychodynamics underlying her judgment does not mean that they aren't relevant . . ..

Damman Depo. [#53-1]: 287:13 - 289:23.

In its Motion for Sanctions, DHHA identified numerous instances, in addition to the ones cited above, where Ms. Archer's language and behavior "impeded, delayed and frustrated" the fair examination of the deponent.  Fed.R.Civ.P. 30(d)(2).   Ms. Archer's conduct fell below professional standards required in courtrooms, and which also apply in deposition settings.  "It is precisely when animosity runs high that playing by the rules is vital. Rules of legal procedure are designed to defuse, or at least channel into set forms, the heated feelings that accompany much litigation. Because depositions take place in law offices rather than courtrooms, adherence to professional standards is vital, for the judge has no direct means of control." *Redwood v. Dobson*, 476 F.3d 462, 469–70 (7th Cir. 2007)

B.  Appropriate Sanctions

Discovery abuse has been a topic of widespread concern in the legal community. *See Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1330 (8th Cir.1986); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Preventing such abuse depends in part on reducing the reluctance of attorneys to seek sanctions and of judges to impose them. *See Matter of Yagman*, 796 F.2d 1165, 1182 (9th Cir.1986); *see also* Fed.R.Civ.P. 26, advisory committee notes (1983 amendments). The purpose of sanctions is to "penalize those whose conduct may be deemed to warrant" them and "deter those who might be tempted to such conduct in the absence of such a

deterrent." *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976). Sound

authority must support a sanction, and the manner in which the sanction is imposed must be

consistent with its purpose. *See Matter of Yagman*, 796 F.2d at 1183–84; *see also Federal*

*Judicial Center, Manual for Complex Litigation* § 10.155 (4th ed. 2008); *cf. Johnson Int'l Co. v.*

*Jackson Nat'l Life Ins. Co*., 19 F.3d 431, 439 n. 10 (8th Cir.1994).

In its Motion, DHHA notes that Ms. Archer has indicated that the Plaintiff is indigent.

Motion, #53 at 11.  The court may impose an appropriate sanction – including the reasonable

expenses and attorney's fees incurred by any party – on a person who impedes, delays or

frustrates the fair examination of the deponent.  Fed.R.Civ.P. 30(d)(2).  In this case, defense

counsel asked Ms. Archer over and over again to stop insulting Ms. Damman.  Ms. Archer was

on notice throughout the deposition that DHHA considered her questioning abusive and

insulting.  Ms. Archer made it clear in the deposition, and in her Response, that she believes that

her deposition questioning style is acceptable and effective.  It is not.  Therefore, the Special

Master orders Ms. Archer, personally, to pay for DHHA's defense of Ms. Damman's deposition,

for its fees and costs in presenting this matter to the Court, and for the fees and costs of the

Special Master in preparing the discovery order relating to the Motion for Sanctions and any

follow-up relating to the reasonableness of Defendant's fees.  Defendant's affidavit of expenses

and fees incurred in defending Ms. Damman's deposition and in preparing and filing the Motion

for Sanctions is due within 10 days of the date of this Order.  Plaintiff may respond to the

reasonableness of those expenses and fees within seven days after Defendant's filing.

III.     **PLAINTIFF'S RENEWED MOTION TO COMPEL AND CHALLENGE TO DEFENDANT'S BELATED CLAIM OF ATTORNEY-CLIENT PRIVILEGE**

On July 20, 2020, Plaintiff filed her Renewed Motion to Compel and Challenge to Defendant's Belated claim of Attorney-Client Privilege ("Motion to Compel") pursuant to Fed.R.Civ.P. 37(b) to compel production of 1) documents relating to employee complaints about DHHA human resources employee Sheila Paukert, the supervisor of DHHA employee Jill Damman, and 2) the personnel file of Barry Platnick, M.D.  She further challenges the Defendant's designation of notes of a meeting as attorney-client privileged communications. DHHA claims that the notes of the meeting relating to Plaintiff's termination of employment are privileged because DHHA's in-house counsel attended the meeting to give legal advice. Response to Motion to Compel, #67, p.13.

A.   Discovery relating to DHHA employee Sheila Paukert

In her Motion to Compel, Plaintiff requests this Court issue an order compelling DHHA to respond to Plaintiff's Interrogatory #4 to identify every employee complaint against Sheila Paukert, and Plaintiff's Request for Production #7, compelling production of all documents relating to employee complaints about Sheila Paukert.  At the Hearing on May 22, 2020, the Court denied, without prejudice, the Plaintiff's Motion to Compel unless evidence established that Ms. Paukert is the person who decided that Plaintiff's employment would be terminated. May 22, 2020 Hearing Transcript, #77, 23:21 – 24:16.

In her Motion to Compel, Plaintiff points out that DHHA, through its counsel, represented to the Court during the hearing on May 22, 2020 that Ms. Paukert was not the decision-maker regarding the termination of Plaintiff's employment:  DHHA employee Jill Damman was the decision-maker.  Plaintiff comments, in her Motion to Compel, that Magistrate

Judge Mix denied Plaintiff's Motion to Compel at the May 22, 2020 hearing only because of this representation of DHHA counsel, Ben Hudgens, as an "officer of the court *and perhaps Chief Judge Brimmer's former law clerk . . .*" (emphasis added). Motion to Compel, #55, p. 4. This very troubling allegation that Magistrate Judge Mix's decision-making was based on her indiscriminate willingness to believe the statements of DHHA's defense counsel due to his status as a former law clerk to a federal court judge appears to be stated with reckless disregard to the truth or falsity of her statement, and impugns the integrity of Magistrate Judge Mix in violation of C.R.P.C. 8.2(a), D.C.COLO.LAttyR 2 (a).

At the May 22, 2020 hearing, Magistrate Judge Mix made clear that the Court, citing the Tenth Circuit, views personnel records as sensitive. There is a "heightened obligation for protection of these records . . .." May 22, 2020 Hearing Transcript, #77, 23:21 – 24:4. Further discovery would only be allowed to the extent that evidence showed a direct link of Ms. Paukert as the decision-maker on Ms. Nichols' employment termination.

Ms. Nichols cites several instances in deposition discovery where Ms. Paukert testified that she was involved in the decision-making process to terminate Ms. Paukert's employment.

> Q.      . . . [I]n response to my question, were you involved in the decision-making process to terminate Carol's employment, based on the evidentiary record, the answer is yes.

> [Objection as to form]

> A.   Yes.

Paukert Depo., #55-3, 234:19-25.

In her deposition, Ms. Damman testified as follows:

> Q.      Was Sheila Paukert involved in the decision to terminate Carol Nichols?

> A.      I consulted with Sheila.  Yes.

16

Q.      Did you consult with Ms. Paukert with respect to every step of the termination
        decision, based on your e-mails and your text messages?

[Objection as to form]

A.   I consulted with her throughout the course of the investigation and then discussed
     with her the decision on how to proceed.  Yes.

Damman Depo., #53-1, 285:13-22

Fed.R.Civ.P. 26(b)(1) states that parties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case, considering the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the

importance of the discovery in resolving the issues, and whether the burden or expense of the

proposed discovery outweighs its likely benefit.

As such, the requested information must be nonprivileged, relevant, and proportional to

the needs of the case to be discoverable. Relevance during discovery is broad, and does not mean

the information obtained would necessarily be admitted at trial. If the party seeking discovery

meets its initial, minimal burden to demonstrate its request is relevant on its face, the resisting

party "…must either demonstrate the discovery sought does not come within the broad scope of

relevance defined in Rule 26(b)(1), or that it is of such marginal relevance that the potential harm

caused by the discovery would outweigh the presumption in favor of broad disclosure." *See*

*Smith v. Kansas Pub. Employees Ret. Sys*., 2019 WL 1171512, at *2 (D. Kan. Mar. 13, 2019)

Plaintiff has provided sufficient evidence to show that Ms. Paukert was substantially

involved in the decision to terminate Plaintiff's employment.  Courts have ordered disclosure of

employment information where an individual either 1) is alleged to have engaged in the

retaliation or discrimination at issue or 2) is alleged to have played an important role in the

decision or incident that gives rise to the lawsuit.  *See Nelson v. The Farm*, 2008 WL 2944911,

*4 (D. Kansas), citations omitted.  However, the courts have further held that there must be a

showing of relevance before production will be ordered.  *Mestas v. Town of Evansville*, 2017 WL

6551288, *4 (D. Wyoming 2017).  In the present case, Plaintiff's interrogatory #4 and request

for production #7 requests DHHA identify every employee complaint regarding Ms. Paukert, and

all documents regarding any employee complaints about Ms. Paukert.  This request is overbroad

because it seeks information and documents that may contain information collateral and

irrelevant to the case.  For instance, Ms. Paukert's supervisor may have "complained" that Ms.

Paukert did not promptly complete employee reviews, or an employee may have "complained"

to another human resources professional that Ms. Paukert failed to promptly return a phone call.

The Plaintiff's complaint is focused on race and disability discrimination.  The Special Master

denies Plaintiff's Motion to Compel responses to interrogatory #4 and request for production #7

to the extent it is overbroad.  The Plaintiff may amend her discovery requests and narrowly tailor

them to ask for information from DHHA about complaints against Ms. Paukert that relate

directly to the claims in the Plaintiff's Complaint, which the Special Master would consider to be

discoverable.  *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008)(more

narrowly targeted discovery request might present a different question).

B.  Discovery relating to Barry Platnick, M.D.

Plaintiff requests that DHHA be compelled to respond to her interrogatory #4 and request

for production #8, essentially producing the complete personnel file of Barry Platnick, M.D.  Dr.

Platnick played no role in the decision to terminate Plaintiff's employment, except as a witness

in Jill Damman's investigation concerning the veracity of the Plaintiff's allegation that she had

interviewed Dr. Platnick about the complaint made by an employee about him.

At the May 22, 2020 hearing, Magistrate Judge Mix orally granted, in part, Plaintiff's motion to compel discovery relating to Dr. Platnick, ordering DHHA to produce information about complaints made about Dr. Platnick from June 21, 2019, the date of Plaintiff's termination of employment, through the present.  May 22, 2020 Hearing Transcript, #77, 31:4-32:22; Courtroom Minutes, #44, p. 2.  DHHA contends that it has complied with the Court's ruling.  No documents were produced, because no documents responsive to the request for information, as narrowed by Magistrate Judge Mix, exist.  DHHA's Response to Motion to Compel, #67, p. 9.

The focus of Plaintiff's Motion to Compel is a repeat of the arguments she presented to the Court at the hearing on May 22, 2020.   In her Motion to Compel, Plaintiff makes an extensive argument, asserting the DHHA is "stonewalling."  She interlaces her argument with quotes from DHHA employees acknowledging that any discipline Dr. Platnick may have received, over time, would be recorded in his personnel file.  However, Plaintiff again fails to establish the relevance of Dr. Platnick's discipline, as it may or may not appear in his personnel file.

Plaintiff goes on to claim, in an obtuse way, that the evidence shows that documents exist which are responsive to her discovery requests regarding complaints about Dr. Platnick and/or his job performance from the date of Plaintiff's termination to present.  She points to records which indicate that Dr. Platnick was the subject of a sexual harassment complaint in March 2018 and a decision-making leave in May 2019, relating to his failure to comply with educational requirements required to maintain DHHA's accreditation.  Motion to Compel, #55, pp. 9-10. However, Plaintiff's argument focuses on incidents from prior to Plaintiff's termination, which, as already has been established, is not the relevant time frame for discovery.

It is undisputed that in May, 2019, prior to Plaintiff's termination, Dr. Platnick received a decision-making leave for failure to complete a two-hour educational course. Response to Motion to Compel, #67, p. 8; Paukert Depo., #55-3, 42:14–44:25. There is some ambiguity about whether that disciplinary action for failure to complete an educational course was modified in October, 2019. Nevertheless, any such discipline is irrelevant to Plaintiff's allegation that she was terminated illegally as a result of race or disability discrimination. Dr. Platnick was not involved in the decision to terminate Plaintiff's employment, and Plaintiff does not contend that he was. Plaintiff's claim that DHHA is trying to "protect" Dr. Platnick does not support the arguments in her Motion to Compel. Further, the argument that DHHA was protecting Dr. Platnick contradicts Plaintiff's argument that she was terminated as a result of race or disability discrimination.

Courts in the Tenth Circuit recognize that an individual's personnel file is discoverable upon a showing of relevance. *Mestas v. Town of Evansville*, *supra* at *4. Personnel files contain sensitive personal information. It is "not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly." *Regan-Touhy v. Walgreen Co*., 526 F.3d at 648. The Tenth Circuit has endorsed the Supreme Court edict that "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery [to protect] 'a party or person from annoyance, embarrassment, [or] oppression . . . .'" *Id., citing Herbert v. Lando*, 441 U.S. 153, 177 (1979); *also citing Gehring v. Case Corp*., 43 F.3d 340, 342 (7th Cir. 1994)(no abuse of discretion where "privacy interests, coupled with [the district court's] determination to keep the trial focused . . . , justified limiting [plaintiff's discovery of] personnel files"). In the present case, Plaintiff has

failed to show the relevance of Dr. Platnick's personnel file to her case.  Therefore, the Motion to Compel is denied.

### C.  Discovery relating to Privileged Attorney-Client Communications

In her Motion to Compel, Plaintiff requests this Court reverse a claim of attorney-client privilege belatedly asserted by DHHA of hand-written notes about a meeting that was attended by DHHA employees Sheila Paukert, Michelle Fournier-Johnson (Chief HR Officer) and in-house counsel, Karen McTavish.  Motion to Compel, #55, p. 12.  DHHA claims that when it first produced the hand-written notes, they were illegible.  It produced a legible copy of the notes on May 4, 2020 to Plaintiff.  DHHA did not realize until June 28, 2020, two days prior to Jill Damman's deposition, that the hand-written notes included a paragraph written during and about a meeting with in-house counsel for the purpose of obtaining legal advice.  Response to Motion to Compel, #67, p. 10.  DHHA sent Plaintiff a claw-back letter, informed Plaintiff of the asserted privilege during Ms. Damman's deposition, and instructed Ms. Damman not to answer deposition questions concerning the meeting that took place with DHHA's in-house counsel present.  Damman Depo., #55-7, 208:1 – 213:2.

Plaintiff's central argument is that notes of the meeting are not privileged, even though DHHA's in-house counsel was present, because one of the meeting attendees (Ms. Paukert) testified in her deposition "that litigation was NOT contemplated" when the termination meeting occurred.  Motion to Compel, #67, p. 13.  Plaintiff relies on *National Farmer's Union v. District Court,* 718 P.2d 1044, 1050 (Colo. 1986) for her proposition that documents prepared by a lawyer are not privileged unless litigation was contemplated at the time the attorney was engaged in the business activity.  The facts of *National Farmer's Union* are not applicable to this case, and the Colorado Supreme Court's opinion does not support Plaintiff's argument.

In *National Farmer's Union*, the Colorado Supreme Court holds: "Communications between attorney and client and advice given by the attorney must remain confidential to insure the proper functioning of the legal system." *Id*. at 1046. The Court further noted that the attorney-client privilege exists to protect the giving of professional advice to those who can act on it, and the giving of information to the lawyer to enable him to give sound and informed advice. *Id., citing Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981). In *National Farmer's Union*, the Court held that notes of a factual investigation relating to the issuance of an insurance policy were not confidential. Nowhere did the decision state or imply, as Plaintiff claims, that a determining factor as to the application of the attorney-client privilege was whether litigation was contemplated at the time of the attorney's involvement with the corporate client.

*Upjohn Co. v. United States, supra*, generally stands for the proposition that while the attorney-client privilege protects communications between clients and attorneys, it does not protect the underlying facts contained within those communications. *Id.* at 395–96. It stands for the proposition that although factual information is not protected by the attorney-client privilege, a blanket request for a party's communications with its lawyer is prohibited. That is precisely what is being sought by Plaintiff here. According to Defendant, the notes of the meeting attended by DHHA's in-house counsel contained communications by Defendant's agents to counsel for the purpose of receiving legal assistance relating to Plaintiff's termination. *Upjohn* allows Plaintiff to ask Defendant about the relevant facts of Plaintiff's termination, apart from any communications that Defendant may have had about those facts with its counsel.

Next, the Court addresses whether the documents at issue are discoverable because they contain business, as opposed to legal, advice. "Because the privilege promotes the 'dissemination of sound legal advice,' it applies only where the advice is legal in nature, and not where the

22

lawyer provides non-legal business advice."  *Iowa Pacific Holdings, LLC v. National Railroad Passenger Corp.*, 2011WL1527599 (D. Colo. 2011), *citing Pownell v. Credo Petroleum Corp.*, No. 09–cv01540–WYD–KLM, 2011 WL 1045418, at *2 (D.Colo. Mar.17, 2011) (unpublished decision) (citations omitted). Defendant met its burden of alleging that the document containing notes of a meeting with in-house counsel are privileged. Moreover, other than Plaintiff's self-serving and conclusory statements, coupled with her misstated legal theory, there is no evidence or law to support the argument that the notes designated as attorney-client privileged simply contain business advice. Indeed, through its agents, Defendant avers that such documents reflect legal advice and should therefore be protected.

## IV. CONCLUSION

Prior to July 20, 2020, the parties contacted the Court regarding a discovery dispute, which prompted the Court to issue a Minute Order, #52, on July 20, 2020.  The text of it appears to be straight-forward, and stated, emphasis in the original, the following:

> This matter is before the Court on Plaintiff's discovery dispute e-mailed to the Court on July 20, 2020, pursuant to the undersigned's discovery procedures.  IT IS HEREBY ORDERED that Plaintiff shall submit the discovery dispute by written motion on the electronic docket **no later than July 27, 2020**. Defendant shall file a Response **no later than August 5, 2020**, and Plaintiff may file a Reply no later than August 10, 2020. Each brief is limited to **five (5) pages**, exclusive of signature blocks and the certificate of service. Exhibits are limited to a **total of fifty (50) pages for each side.**

Despite the specific instruction to the parties to limit briefs to five pages and exhibits to 50 pages, Plaintiff's Motion to Compel was 16 pages, and her exhibits totaled 295 pages. Magistrate Judge Mix pointed out the excessive pages filed by Plaintiff in her Order Appointing Master for Discovery #74, p. 2.  The Order instructed: "It is time for counsel to take a hard look at whether her own actions have unnecessarily complicated, lengthened and burdened the

discovery process." Despite this clear admonition, no amended, and shortened Motion to Compel, was filed.

Instead of striking the Plaintiff's Motion and ordering her to re-submit her Motion in compliance with the Court's Minute Order, #52, the Special Master spent additional time reading and reviewing Plaintiff's excessive pages and exhibits. Because additional time was necessitated by Plaintiff's inability to follow a court order regarding length, the Special Master orders that Plaintiff pay for 75% of the Special Master's time related to addressing the issues raised in her Motion to Compel, which were, for the most part, denied.

For the foregoing reasons, and in accordance with the Order Appointing Master for Discovery, #74, IT IS ORDERED as follows:

(1)  The Motion for Sanctions is GRANTED.  Merrily S. Archer, Esq., counsel for Plaintiff, shall pay Defendant's attorney's fees and costs for filing the Motion for Sanctions, and the Reply thereto.   Defendant's affidavit of expenses and fees incurred in bringing the motion is due within 10 days of the date of this Order.  If the Plaintiff has any comment about the reasonableness of the amount of fees and costs sought by Defendant, Plaintiff may respond within seven days after Defendant's filing, and the matter will be decided by the Special Master.   Plaintiff's counsel shall be responsible for paying Defendant's fees and costs within 10 days after Defendant's submission of its affidavit, or within 10 days of the Special Master's Order determining the amount of fees and costs to be paid, if that amount is disputed by Plaintiff's counsel.

(2) Ms. Archer shall pay all fees and costs of the Special Master connected to deciding the Motion for Sanctions, and any follow-up work to decide the reasonableness of Defendant's expenses and fees.

(3) Any objections to this Order regarding Defendant's Motion for Sanctions under F.R.C.P. 53(f)(2) shall be made after a final ruling regarding the reasonableness of the amount of Defendant's expenses and fees to be paid.

(4) The parties to this dispute – Nichols and DHHA -- are ordered to pay the below-signed Special Master's fees and costs for the work performed by the below-signed Special Master relating to Plaintiff's Renewed Motion to Compel and Challenge to defendant's Belated Claim of Attorney/Client Privilege pursuant to the Order Appointing Master for Discovery (Document #74) in the following proportions: Plaintiff:  75% and Defendant:  25%.

(5) Payment for all general review and editing time of the Special Master shall be divided between the parties equally.   A statement detailing the Special Master's time and fees shall be forwarded directly to counsel for the parties.

DATED:  September 14, 2020                    BY THE SPECIAL MASTER:

/s/ Jane G. Ebisch, Esq.