IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez

Civil Action No. 19-cv-2818-RMR-KLM

CAROL NICHOLS, on behalf of herself and similarly situated employees,

     Plaintiff,

v.

DENVER HEALTH AND HOSPITAL AUTHORITY,

     Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on the Defendant's Motion for Summary Judgment, ECF 130. The Plaintiff filed a response to Defendant's motion, at ECF146. The Defendant filed a reply, at ECF 157. The issue is fully briefed and is ripe for review. For the following reasons, the Defendant's motion is **GRANTED in part** and **DENIED in part.**

### I.     STATEMENT OF FACTS

This matter arises out of Plaintiff's termination from Defendant Denver Health and Hospitality Authority on June 21, 2019. The Plaintiff was hired in January 2017 as an employee relations investigator. ECF 130, ¶ 1. The Plaintiff's employment with Defendant was at-will. *Id.* at ¶ 2. Plaintiff's primary duties included conducting investigations into employee complaints, conducting interviews into complaints, completing written investigative reports, and making recommendations as to possible discipline. *Id.* at ¶ 4.

The Plaintiff was directly supervised by Sheila Paukert beginning in January 2018 and was subsequently supervised by Jill Damman beginning in June 2018. *Id.* at ¶¶ 7-8. The Plaintiff alleges that Ms. Paukert's treatment toward her during her employment was dismissive, rude, and unpleasant. ECF 146, p. 11.

The Plaintiff was diagnosed with leukemia in 2009 and was in remission at the time she began her employment with Defendant. ECF 130, ¶ 9. In April or March 2019, Plaintiff requested and was approved for medical leave for treatment related to leukemia. *Id.* at ¶ 18. Plaintiff had also requested and been approved for medical leave on two prior occasions, in April 2018 and October 2018. *Id.* at ¶¶ 11-17. On May 25, 2019, after Plaintiff had requested an extension of her medical leave, Ms. Damman communicated to Ms. Paukert that Plaintiff had been told to return by June 3, 2019. That same day, Ms. Damman inquired internally about "how much more ADA leave [Plaintiff] has available." Defendant's Chief Human Resources officer commented "I am concerned that we have no designated end timeframes." ECF 146, ¶¶ 7-9.

Plaintiff returned to work full time on June 4, 2019. *Id.* at ¶ 24. Following Plaintiff's return to work, the Plaintiff told Ms. Damman that she had become lost in a Safeway parking lot. Plaintiff also told Ms. Damman that she had to write everything down because she had been experiencing a "foggy brain." *Id.* at ¶ 22.

Shortly after her return to work, the Plaintiff was assigned an investigation involving allegations of sexual harassment by a physician, Dr. Platnick. ECF 130, ¶ 35, ECF 146, ¶ 35. The Plaintiff indicated to her supervisors that she had interviewed Dr. Platnick and

a witness to the alleged harassment, Sherry Peckham. The Plaintiff indicated that Ms. Peckham corroborated the sexual harassment allegations against Dr. Platnick. *Id.* at 37. Thereafter, Defendant was informed that Dr. Platnick had not actually been interviewed by the Plaintiff. ECF 130, ¶¶ 43, 45. Plaintiff's supervisor also spoke with Sherry Peckham, and Ms. Peckham indicated that while she did speak with the Plaintiff, she told the Plaintiff that she had no recollection of the alleged incident. *Id.* at 46, ECF 146, ¶ 45.

Plaintiff's supervisor, Ms. Damman, asked Plaintiff whether she had actually spoken to Dr. Platnick. The Plaintiff stated that she had "brain fog," but believed that she had talked to him. In her deposition, the Plaintiff stated that she eventually told Ms. Damman that "she may not have" spoken to Dr. Platnick. The Plaintiff admits that she cannot confirm whether she spoke to Dr. Platnick because of the "chemo-brain" and "brain fog" that she was suffering at the time. ECF 146, ¶ 50. The Defendant reviewed Plaintiff's phone records and did not find evidence of a call to Dr. Platnick. The Plaintiff contends that she may have used her cell phone, but there is not evidence of her cell phone records. *Id.* at ¶ 48.

Following this incident, the Defendant made the decision to terminate the Plaintiff. ECF 130, ¶ 51. The parties dispute who, specifically, made the decision to terminate the Plaintiff. The Defendant states that Ms. Damman made the decision to terminate the Plaintiff. *Id.* The Plaintiff alleges that Ms. Paukert made the decision to terminate the Plaintiff. ECF 146, ¶ 51.

Following her termination, the Plaintiff filed this action. The Plaintiff filed her Amended Complaint on September 14, 2020. The Plaintiff alleges eight causes of action. She alleges racial discrimination in violation of Title VII and 42 U.S.C. § 1981 (Claims I and II); she alleges a pattern and practice of discrimination based on race in violation of Title VII and § 1981 (Claim III); she alleges retaliation under Title VII (Claim IV); she alleges violations of the Americans with Disabilities Act ("ADA") for failure to accommodate (Claim V), unlawful termination (Claim VI), and retaliation (Claim VII); Plaintiff finally brings a claim for promissory estoppel (Claim VIII). The Defendants have filed a motion seeking summary judgment on all claims.

For the reasons stated herein, the Defendant's motion is granted as to Plaintiff's Title VII, § 1981, and promissory estoppel claims. The Defendant's motion is denied as the Plaintiff's ADA claims.

## II.    LEGAL STANDARDS

To succeed on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine dispute of material fact; and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When analyzing a motion for summary judgment, the court must look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). However, the nonmoving party may not simply rest upon its pleadings at this stage; rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact

could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249.

### III.    ANALYSIS

### A.    Title VII and § 1981 Discrimination Claims (Claims I and II)

#### 1.    Legal Framework

In Claims I and II, the Plaintiff alleges disparate treatment under Title VII and race discrimination under 42 U.S.C. § 1981.  The standards of proof are the same whether the plaintiff alleges violations of Title VII or § 1981. *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). "A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the standards are the same—either by direct evidence of discrimination, or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) [.]" *Crowe*, 649 F.3d at 1194 (citations omitted). Plaintiff here has offered no direct evidence of discrimination, so her claims proceed under the *McDonnell Douglas* framework.

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a legitimate, non-discriminatory reason for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual. *Crowe*, 649 F.3d at 1195.

To establish a prima facie case of discrimination, a plaintiff must demonstrate: (1) she was a member of a protected class; (2) she was qualified and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Plaintiffs can establish evidence of the third prong in various ways, such as "actions or remarks made by decisionmakers," "preferential treatment given to employees outside the protected class," or "more generally, upon the timing or sequence of events leading to plaintiff's termination." *Id.*

### a.    *Prima Facie Case of Discrimination*

The Defendant argues generally that "Plaintiff is unable to establish the third element of a prima facie case," but its argument on this issue focuses on pretext, which is not itself an element of a prima facie case of discrimination. In order to reach the Defendant's arguments regarding its legitimate reasons for termination and regarding pretext, the Court will assume for the purposes of this motion that Plaintiff has made prima facie showing of discrimination.

b.    *Defendant's Legitimate Reasons*

Under *McDonnell Douglas*, the burden now shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. The Defendant states that it terminated the Plaintiff for making false statements in connection with the investigation of Dr. Platnick. The Plaintiff does not offer any specific argument on this issue, and the Court nonetheless finds that the Defendant's proffered reason satisfies its burden at this stage.

c.    *Pretext*

Both parties dedicate a substantial portion of their arguments to the issue of pretext. On this issue, Plaintiff bears the burden. A plaintiff can establish pretext "by showing the defendant's proffered nondiscriminatory [] explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (citations omitted). "Evidence that the employer should not have made the [adverse employment] decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Id.* "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* At this stage, the plaintiff must show not merely that the proffered reasons are pretextual but that they are "a pretext for discrimination." *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1321 (10th Cir. 1992).

7

i.      *Subjective ABP Decision-making Practices*

The Plaintiff first argues that the non-progressive nature of the Defendant's Accountability Based Performance ("ABP") Policy "foster[s] fertile ground for unlawful discrimination on an individual and systemic basis." ECF 146, p. 17. The Plaintiff directs the Court to *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-991 (1988). The Plaintiff argues that the Supreme Court in *Watson* "acknowledged the hazards of subjective decision-making, like DHAA's Paukert-modified ABP practices…" ECF 146, p. 17. While the Court in *Watson* may have acknowledged that subjective or discretionary employment practices "may be analyzed under the disparate impact approach in appropriate cases," it does not instruct that such practices are, themselves, evidence of pretext. Here, there is nothing to suggest that the subjective decision-making policies were adopted with discriminatory intent, or that the use of a subjective ABP process is inconsistent with or contradictory to the Defendant's stated reasons for termination. To the extent that the Plaintiff suggests that this policy was applied in a discriminatory way, those arguments are addressed further, *infra*.

ii.      *Falsity, Disproportionality, and Credibility*

The Plaintiff argues that the Defendant's proffered reason for terminating her was false. She specifically argues that Dr. Platnick, who is Caucasian, was placed on Decision-Making Leave ("DML"), shortly before and after Plaintiff's termination "for (a) at least three substantiated sexual harassment claims in less than 18 months; and (b) flouting training requirements imposed by DHHA's accreditor." ECF 146, p. 18. The Plaintiff thus argues that her "memory lapse could not have jeopardized Dr. Platnick's

8

employment given that DHHA was already severely disciplining him for unrelated misconduct (i.e., Falsity)." The Defendant admits that various complaints were made against Dr. Platnick related to inappropriate comments, but it denies that he faced a DML because of these complaints. Instead, Defendant argues that Dr. Platnick faced a DML "due to a failure to complete a short annual education course." ECF 157, pp. 7-8, ¶¶ 24-25.

The Tenth Circuit has recognized that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing to *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). In drawing a *Reeves*-type inference, the Tenth Circuit instructs that "the factfinder must be able to conclude, based on a preponderance of the evidence, that *discrimination was a determinative factor* in the employer's actions—simply disbelieving the employer is insufficient." *Id.* (emphasis in original). That Dr. Platnick may have been on DML at the time that the Plaintiff was terminated does not necessarily establish falsity of Defendant's purported reason for termination. The Defendant here alleges that Plaintiff was terminated for making false statements regarding the

investigation. That the target of that investigation was himself subject to discipline does not undermine that reason.[1]

The Plaintiff also alleges that her discipline was disproportionate when compared with that imposed on Dr. Platnick. The Plaintiff alleges that Dr. Platnick's "far more on-going 'egregious' conduct" was tolerated. This disproportionate discipline, the Plaintiff argues, "smacks of severity bias." ECF 146, p. 19. On this issue, the Court finds the Tenth Circuit's analysis in *E.E.O.C. v. Flasher Co., Inc.* instructive. 986 F.2d 1312 (10th Cir. 1992)

In *Flasher*, the Tenth Circuit considered unexplained disparities in treatment between a minority employee and a non-minority employee. The Court explained that "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal." *Id.* at 1319. "The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality… It prohibits only intentional discrimination based upon an employee's protected class characteristics." *Id.* "It is error to assume," the Tenth Circuit instructed, "that differential treatment between a minority employee and a non-minority employee that is not explained by the employer in terms of a rational, predetermined business policy must be based on illegal discrimination

---

[1] Further, it does not appear that the Defendant has suggested that its reason for terminating the Plaintiff was that specifically that she jeopardized Dr. Platnick's employment.

because of an employee's protected class characteristics. Such an assumption is neither correct under the law nor is it an accurate reflection of reality." *Id.* 1319-1320.

The Court explained that

[s]ometimes apparently irrational differences in treatment between different employees that cannot be explained on the basis of clearly articulated company policies may be explained by the fact that the discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different, or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished, or even that the less severely sanctioned employee may be more valuable to the company for nondiscriminatory reasons than is the other employee. Other times, no rational explanation for the differential treatment between the plaintiff and the comparison employees may be offered other than the inevitability that human relationships cannot be structured with mathematical precision, and even that explanation does not compel the conclusion that the defendant was acting with a secret, illegal discriminatory motive.

*Id.* (citations omitted).

The Plaintiff argues that it is irrelevant that Dr. Platnick, as a trauma surgeon, may be "more 'valuable' than Plaintiff" because the Defendant's "universal" ABP policy does not countenance such distinctions. But the Plaintiff here fails to offer any evidence suggesting that Dr. Platnick was treated differently *because he was Caucasian* than, for example, because he was a physician. *See id.* at 1321 ("even a finding that the reason given for the discipline was pretextual, does not compel [an inference of illegal discrimination], unless it is shown to be a pretext *for discrimination against a protected class*.) (emphasis in original).

The Plaintiff here has not established that the disparity in treatment between herself and Dr. Platnick supports an inference that the Defendant's stated reason for

11

termination of the Plaintiff was mere pretext for discrimination based on the Plaintiff's race.[2]

### iii.        *Dr. Daniel Kuang's Findings*

The Plaintiff argues that the findings of her expert, Dr. Daniel Kuang, support a finding of pretext. The Plaintiff does not specifically set forth Dr. Kuang's findings in her opposition. She instead asserts that "Daniel Kuang, Ph.D., detected 'astronomical' severity bias against African American employees with corresponding leniency bias favoring Caucasian/White ones when analyzing ABP decisions since 2017." ECF 146, p. 18. The Defendants have filed a motion to strike the expert report of Dr. Kuang, which is pending before this Court. Even assuming that Dr. Kuang's report is admissible, the Court finds that it fails to establish pretext. "It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class." *Timmerman v. U.S. Bank*, N.A., 483 F.3d 1106, 1114 (10th Cir. 2007). However, "[s]tatistics taken in isolation are generally not probative of ... discrimination, and statistical evidence on its own will rarely suffice to show pretext. *Id.* at 1114-1115 (citations omitted). The Tenth Circuit has instructed that, at the very least, "in order to create an inference of pretext, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory

---

[2] This analysis also applies to the Plaintiff's argument that "other comparators" were permitted to work from home while Plaintiff was not.

explanations for the disparate treatment by showing disparate treatment between comparable individuals." *Id.*

First, as analyzed, *supra*, the Plaintiff has failed to identify other evidence sufficient to support a finding of pretext. The Plaintiff's argument regarding pretext therefore rests on its statistical evidence. Under *Timmerman*, it is unlikely that statistical evidence alone can establish pretext.

Even if the statistical evidence could, on its own, establish pretext, the statistical evidence cited by the Plaintiff does not support a finding that the Defendant's stated reasons for terminating the employee were pretext for prohibited discrimination. The Tenth Circuit has instructed that statistical evidence must compare employees that are "similarly situated." *Id.* at 1115; *see also Voltz v. Coca-Cola Enterprises Inc.*, 91 F. App'x 63, 70–71 (10th Cir. 2004). This means that "the situation of the employees in the protected class must have been comparable to the situation of the employees in the non-protected class who were allegedly treated more favorably." *Id.* Here, the Plaintiff presents statistical evidence that she contends reflects severity bias against African American employees. The Defendant argues that the statistical evidence does not support the Plaintiff's argument because it fails to control for nondiscriminatory factors. Namely, the evidence does not analyze disciplinary treatment among individuals who hold the same job titles. The Defendant directs the Court to its Motion to Strike (ECF 124), and its expert's statement that

> Black employees make up only 2% (8) of the 460 physicians, while they make up 16% (51) of the 317 service employees. Differences in ABP decisions or

terminations of physicians versus service employees could incorrectly show up as bias for or against Black employees, even when the percentage of ABP decisions and terminations is exactly the same for Black and White employees within the two job types…For example, for physicians, fewer than 9% (41 out of 460) were subject to at least one ABP decisions, while for Custodians, nearly 50% (132 out of 274) were subject to at least one ABP decision.

ECF 124, p. 5.

Reviewing the Plaintiff's statistical evidence, the Court simply cannot find that it establishes that the Defendant's proffered reason for terminating her was so "incoherent, weak, inconsistent, or contradictory" so as to be unworthy of belief. Even considering the statistics offered, the Plaintiff here has failed to meet her burden because she "has not suggested a congruence between [her] situation and those of the [employees] described in the statistics [she] advances."  *Voltz*, 91 F. App'x at 70–71 ("Voltz presents no evidence of the qualifications for the other minority candidates or the criteria used to fill those other positions. Thus, Voltz has not suggested a congruence between his situation and those of the candidates described in the statistics he advances.")

Because the Plaintiff has not presented evidence establishing that the Defendant's stated reason for terminating her was pretext, she has failed to carry her burden at this stage.  Defendant's motion for summary judgment on the Plaintiff's Claims I and II is **GRANTED.**

### B.      Pattern and Practice Claim (Claim III)

The Plaintiff's Count III alleges a pattern and practice of discrimination based on race in violation of Title VII and § 1981. "Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination. In a case involving individual claims of discrimination, the focus is on the reason(s) for the

particular employment decisions at issue. In contrast, the initial focus in a pattern-or-practice case is not on individual employment decisions, "but on a pattern of discriminatory decisionmaking." *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (citations omitted).

Pattern-or-practice cases are typically tried in two or more stages. During the first stage of trial, the plaintiff's "burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Id*. At this stage, the Plaintiff bears the burden of establishing that a discriminatory policy existed. *Id.* If the Plaintiff meets this burden, the burden shifts to the employer "to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Id*. "If an employer fails to rebut the inference that arises from the [plaintiff's] prima facie case," the finder of fact can conclude "that a violation has occurred" and the trial court can award prospective equitable relief. *Id*.

If the plaintiff also seeks "individual relief for the victims of the discriminatory practice," the case moves into the second or subsequent stages. *Id.* "The second stage of a pattern and practice claim is essentially a series of individual lawsuits, except that there is a shift of the burden of proof in the plaintiffs' favor." At this stage, "it must be determined whether each individual plaintiff was a victim of the discriminatory practice. Importantly, by having prevailed in the first stage of trial, the individual plaintiffs reap a significant advantage for purposes of the second stage: they are entitled to a presumption that the employer had discriminated against them." *Id.*

We must thus first consider whether the Plaintiff has met her burden of demonstrating that unlawful discrimination has been a regular procedure or policy followed by the Defendant. "One well-recognized means of establishing discrimination is to show that employees in the protected class were treated less favorably or more harshly than employees outside the protected class*." Equal Emp. Opportunity Comm'n v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1188 (D. Colo. 2018). A plaintiff can establish that an employer's disciplinary decisions were based on race through either direct or circumstantial evidence. *Id.* Evidence of discriminatory decisions may take the form of "existing policy which itself constitutes discrimination or oral or written statements on the part of a defendant showing a discriminatory motivation." *Id.* Ultimately, "all of the evidence, statistical and nonstatistical, tending to establish a prima facie case should be assessed on a cumulative basis."

The evidence that Plaintiff relies on in support of her pattern and practice claim is the same evidence that she relies on in support of her individual discrimination claim.  The Plaintiff here argues that she has met her burden at the initial stage because she has identified "(1) a specific policy or practice—i.e., [Defendant's] subjective ABP process; and (2) evidence of statistically significant adverse impact by race—i.e., Dr. Kuang's [report]." ECF 146, p. 23. The Plaintiff argues that "in addition to her own testimony, Plaintiff will also introduce anecdotal evidence from, *inter alia*, Dana Turner and Vanessa Vargas about Ms. Paukert's race-skewed disciplinary decisions." *Id.*

When considering a pattern or practices claim, "[s]tatistics must always be evaluated in the context of all of the surrounding facts and circumstances." *Apsley v. Boeing Co*., 691 F.3d 1184, 1195 (10th Cir. 2012). For the reasons set forth, *supra*, the Court has determined that the statistical evidence produced by the Plaintiff does not demonstrate that racial discrimination occurred, nor does it demonstrate that a pattern or practice of racial discrimination existed.

The Plaintiff has not cited to any specific evidence in the record from Dana Turner or Vanessa Vargas. On review of the Plaintiff's response as a whole, the Court notes that the Plaintiff has cited therein to a statement provided by Ms. Turner (ECF 146-23) and a deposition transcript excerpt from the deposition of Ms. Vargas (ECF 146-15). While the Plaintiff did not cite to these exhibits in support of its argument here, the Court nonetheless reviewed the evidence when analyzing this issue. In her statement, Ms. Turner does not provide any evidence of "race-skewed" disciplinary decisions. The only potentially relevant statement in Ms. Turner's statement is as follows: "I recall participating in one, and possibly two external investigations into Ms. Paukert's behavior and treatment of HR employees, particularly African American employees." ECF 146-23, ¶ 7. Ms. Turner does not offer any additional testimony or evidence regarding those investigations, the allegations complained of, or the findings. Ms. Turner further states many workers in the HR department "collided with Ms. Paukert" and "complained about her treatment of them" or "felt like they were being run-over by her." *Id.* She stated that "[i]t seemed more workers were upset with Ms. Paukert at any given time than were not upset with her." *Id.* at ¶ 8.

17

The transcript from Ms. Vargas' deposition similarly fails to provide the support that the Plaintiff claims. Ms. Vargas testified that she was asked "how do you feel being a black woman at Denver Health, like how have you been treated…" She responded that "I remember telling him I had not ever experienced any disparate treatment myself, but I did hear from others that they felt like there was some bias and discrimination towards them." ECF 146-15, 22:24-23:9. These general allegations do not suggest to the Court any specific anecdotal evidence regarding "Ms. Paukert's race-skewed disciplinary decisions." Nor do the statements of either Ms. Vargas or Ms. Turner suggest or support that the Defendant had a pattern or practice of racial discrimination.

Having considered all evidence identified by the Plaintiff, the Court cannot find that the Plaintiff has established a prime facie showing of a pattern of discriminatory decision-making.

Defendant's motion for summary judgment on Plaintiff's Claim III is therefore **GRANTED.**

### C.        Retaliation Claim (Claim IV)

In her fourth claim for relief, the Plaintiff alleges unlawful retaliation under Title VII. Title VII forbids retaliation against employees who voice opposition to . . . an unlawful employment practice." *Montes v. Vail Clinic, Inc.*, 497 F. 3d 1160, 1176. When considering a claim of retaliation, the Court applies the same *McDonnel Douglass* burden shifting framework. First, the Court determines whether the Plaintiff has established a prima facie case of retaliation. A plaintiff establishes a prima facie case of retaliation by

showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Kendrick v. Penske Transp. Servs.,* Inc., 220 F.3d 1220, 1234 (10th Cir. 2000).

In support of her retaliation claim, the Plaintiff alleges that, in May 2018 and September 2018, Plaintiff participated in external investigations regarding Ms. Paukert's treatment of African American women. The Plaintiff argues that "Ms. Paukert, presumably, knows about the *two* external investigations and numerous ValueLine race and retaliation complaints against her, as well as Plaintiff's participation in them. Yet, incredibly, even Ms. Paukert denies knowing about them..." ECF 146, p. 24. The Plaintiff then cites to the testimony of Ms. Paukert, in which she testified that she was not aware that the Plaintiff participated in any investigations regarding her treatment of employees based on race. The Plaintiff has not, however, cited to any evidence suggesting that Ms. Paukert *would or did know* about the investigation against her, or who might have participated in them. Plaintiff's claim that Ms. Paukert "presumably" knew is not supported by any evidence on the record. Thus, while the Plaintiff clearly disputes Ms. Paukert's statements, she has not identified any facts for the court suggesting that such a dispute is genuine.

Even if the Court were to find that a genuine issue of material fact exists as to whether Ms. Paukert knew of the Plaintiff's participation in the investigations, the Plaintiff would still need to establish a causal connection between her protected activity and her

termination. A causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001). The Tenth Circuit has indicated that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Id.*  In contrast, the Court has indicated that "a three-month period, standing alone, is insufficient to establish causation." *Id*.

Plaintiff's protected activity here occurred in May and September of 2018. ECF 130-1, 69:3-25. The Plaintiff was terminated on June 21, 2019. The Defendant argues that the nearly 9-month gap following the alleged protected activity is dispositive as to the Plaintiff's retaliation claim. The Plaintiff counters that she can establish temporal proximity because she spent much of that 9-month period on leave undergoing heart surgery and cancer treatment, "leaving little opportunity for Ms. Paukert to retaliate until her return in June 2019." ECF 146, p. 24. The Plaintiff alleges that she was terminated less than three weeks after her return. The Defendant argues that the Plaintiff was only on leave for four of the nine months following the protected activity.

Even considering that the Plaintiff was on leave for a period of time, there appears to have been at least four months following her protected activity during which she could have been retaliated against but was not. The Plaintiff has not pointed to any additional facts suggesting causation, nor can the Court glean any from the record. The Court thus

finds that the Plaintiff has not met her burden of establishing a prima facie case of retaliation.

Even if the Plaintiff could establish a prima facie retaliation case, the Defendant here has offered a legitimate, non-retaliatory reason for terminating the Plaintiff. As analyzed, *supra*, the Plaintiff has not demonstrated any issues of material fact regarding whether the Defendant's stated reason is pretextual.

Defendant's motion for summary judgment on Plaintiff's Claim IV is **GRANTED.**

### D.      Americans with Disabilities Act Claims

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring ... of employees ... and other terms, conditions, and privileges of employment." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1191 (10th Cir. 2018). Yet again, the Tenth Circuit has instructed that, in the absence of direct evidence of discrimination, a court applies the *McDonnell Douglas* burden- shifting framework to evaluate ADA claims. For the reasons that follow, Defendant's motion for summary judgment is denied as to Plaintiff's ADA claims.

### 1.      Failure to Accommodate (Claim V)

The ADA defines the phrase "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017). Because "any failure to provide reasonable accommodations for a

disability is necessarily because of disability," it follows that a plaintiff need not prove the employer's motivation or intent to discriminate to prevail on a failure to accommodate claim. *Id*. As a result, a failure to accommodate claim is evaluated under a modified *McDonnell Douglas* burden-shifting framework. *Id*. at 1049–50. Under the first step of the modified framework, a plaintiff must demonstrate that "(1) he is disabled; (2) he is otherwise qualified; and (3) he requested a plausibly reasonable accommodation." *Id*. at 1050 (internal quotation marks omitted); *see also Lincoln v. BNSF Ry. Co*., 900 F.3d 1166, 1204 (10th Cir. 2018). If the plaintiff makes a showing on all three elements, the burden "shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Id*. (quotation marks omitted).

The Defendant here argues that the Plaintiff cannot establish the third element of her claim because could not perform her essential job functions with or without accommodation. *See Lincoln v. BNSF Ry. Co*., 900 F.3d at 1205 ("[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job."). The Defendant points to evidence that the Plaintiff could not have been accommodated in her role as an investigator in light of her job functions because "[c]onducting internal investigations concerning the violations at hand clearly requires someone have the capacity to recall the information provided to them and report it properly and accurately. If there are cognitive

deficiencies that would prevent an individual from performing the core of an investigator job, which is to investigate, this would not enable them to continue in their position." ECF 130, p. 18. The Plaintiff, however, has cited to evidence that "in-person/onsite job performance and face-to-face witness interviews were/are simply not essential functions of Plaintiff's position." ECF 146, p. 22.

The Defendant also points to evidence suggesting that, "to this day, Plaintiff cannot return to work because she cannot be medically cleared to return to work." ECF 130, ¶ 31. The Plaintiff denies this allegation, and has pointed to evidence that she "has continued to work as a contract Equal Employment Opportunity (EEO) investigator for the U.S. Department of Interior since her termination." ECF 146, ¶ 31.

Genuine disputes as to material facts thus exist with regard to the Plaintiff's claim for failure to accommodate. These disputes exist both with regard to the Plaintiff's ability to establish a prima facie violation, and with regard to the Defendant's ability to rebut any such claim. Summary judgment is therefore not appropriate on this claim.

### 2.      Unlawful Termination (Claim VI)

To establish a claim for unlawful termination under the ADA, a plaintiff must show: (I) that she is "disabled" within the meaning of the ADA; (ii) that she was able, with or without reasonable accommodation, to perform the essential functions of the job; and (iii) that the employer terminated her because of that disability. *Felix v. City & Cty. of Denver*, 729 F. Supp. 2d 1243, 1262 (D. Colo. 2010). The Defendant's arguments on this issue are the same arguments presented with regard to the ADA failure to accommodate claim.

Unlike the modified *McDonnell Douglas* analysis applied in a failure to accommodate claim, however, the burden here now shifts back to the Defendant to establish a legitimate, nondiscriminatory reason for terminating the Plaintiff. As discussed, *supra*, the Defendant has identified a legitimate, nondiscriminatory reason for its termination. The Defendant has met this burden.

Unlike in our analysis of Plaintiff's race discrimination claims, however, the Plaintiff here has identified facts sufficient for a reasonable jury to determine pretext, and this claim should therefore proceed to trial. Here, the Defendant was terminated just three weeks after returning from leave. Further, disputes exist as to when the Plaintiff informed the Defendant of her "brain fog." The Plaintiff has also identified evidence that her supervisors were discussing her requests for leave prior to the Platnick investigation. These facts, when considered in the light most favorable to the Plaintiff, suggest that sufficient evidence favoring the Plaintiff exists such that a jury could find in her favor. Summary judgment on this claim is therefore not appropriate.

### 3.    Retaliation (Claim VII)

"The ADA's retaliation statute provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting 42 U.S.C. § 12203(a)). Where a plaintiff relies on circumstantial evidence to establish his claim of retaliation under the ADA, the *McDonnell Douglas* burden-shifting framework applies. *Id.*

24

To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) she "engaged in a protected activity"; (2) she was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity"; and (3) there was "a causal connection between the protected activity and the adverse employment action." *Id.* at 1186-87.

The Defendant argues that the Plaintiff could not perform the essential functions of her position with or without an accommodation. As stated, *supra*, genuine issues of material fact exist on that issue, and the Defendant has thus not established an entitlement to summary judgment on that basis. The Defendant next argues that the Plaintiff's request was untimely. The Defendant specifically argues that the Plaintiff did not mention her disability or her need for accommodation until she faced termination. This fact also appears to be disputed. The Plaintiff has identified evidence that she had discussed anticipated cognitive side effects of the CAR-T stem cell procedure. She also identified evidence suggesting that she had informed her supervisor about her "brain fog" on at least two occasions before her termination. ECF 146, p. 3. Because issues of material fact remain in dispute, summary judgment is not appropriate on Plaintiff's ADA retaliation claim.

### E.    Promissory Estoppel (Claim VIII)

The Plaintiff presents a claim for promissory estoppel, alleging that the ABP policy applicable to her was progressive. The Plaintiff argues that the Defendant breached a

written agreement to utilize a progressive disciplinary and rehabilitative process when it terminated her employment without invoking any of the steps set forth in the Policy.

Colorado law presumes that an employee hired for an indefinite period of time is an "at-will" employee. *Continental Air Lines v. Keenan*, 731 P.2d 708, 711 (Colo. 1987). This relationship means that either the company or the employee can terminate the employment relationship "without cause and without notice," and that "termination does not give rise to a cause of action." *Id*. However, this presumption is rebuttable. In certain circumstances an "at-will" employee may enforce an employer's statements, such as those made in an employee manual, on a theory of promissory estoppel. *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1189–90 (D. Colo. 2016).

To hold an employer liable under a theory of promissory estoppel, a plaintiff must show that "the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures, that the employee reasonably relied on the termination procedures to his detriment, and that injustice can be avoided only by enforcement of the termination procedures." *Id.* at 1190.

The Plaintiff here has failed to identify evidence in support of either element, and summary judgment on this claim is therefore appropriate. The Plaintiff states that the ABP policy applicable to her was progressive, but the testimony she cites in support of this statement suggests that "it never was really progressive" and that, to the extent it was, it contained exceptions. ECF 146-24 ("Well. I think it was always [] not progressive because

26

of the things that are egregious, like, stealing and workplace violence that we did not believe that you had to be coached and reminded twice not to do those things. So in that sense, it never was really progressive.") Courts in this district considering promissory estoppel claims similar to the one alleged here have explained that "[i]f an employer's termination policies contain disclaimers, however, courts have found that, as a matter of law, an employee cannot reasonably rely on these policies or on any other statements by an employer regarding termination procedures." *Winkler v. Bowlmor*, 207 F. Supp. 3d at 1190 (citing *Silchia v. MCI Telecomm. Corp.*, 942 F.Supp. 1369, 1376 (D. Colo. 1996)). Nor has the Plaintiff offered any evidence that she detrimentally relied on the ABP policies that she contends were applicable to her. In the absence of facts supporting either element of Plaintiff's claim, the Defendant is entitled to summary judgment on Plaintiff's Promissory Estoppel claim.

## IV.    OTHER PENDING MOTIONS

The Court's ruling on Defendant's motion for summary judgment resolves certain other pending motions as well. Currently pending before the Court is ECF 124, Defendant's Motion to Strike the Expert Report of Dr. Kuang. Because Defendant is entitled to summary judgment on the Plaintiff's Title VII and § 1981 claims, and because Dr. Kuang's expert report appears to relate exclusively to those claims, this issue appears to be moot. The Defendant's Motion to Strike, ECF 124, is therefore **DENIED as moot**. Also pending before the Court is the Plaintiff's Motion to Exclude Testimony of Dr. Salzburg, ECF 116. Dr. Salzburg was retained to rebut Dr. Kuang's findings. Given the

Court's rulings herein, the Plaintiff's Motion to Exclude, ECF 166, is also **DENIED as moot.** Also pending before this Court is the Plaintiff's Motion to Certify Class for Count III Pattern or Practice Claim, ECF 182. Because the Defendant is entitled to summary judgment on Plaintiff's pattern or practice claim, Plaintiff's motion is also moot. The Plaintiff's Motion to Certify Class, ECF 182, is therefore **DENIED as moot.**

## V.    CONCLUSION

For the reasons stated herein, the Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.** It is **ORDERED** that:

1.    Defendant's motion for summary judgment, ECF 130, is **GRANTED** as to Plaintiff's Claims I, II, III, IV, and VIII.

2.    Defendant's motion for summary judgment is **DENIED** as to Plaintiff's Claims V, VI, and VII.

3.    Defendant's Motion to Strike the Expert Report of Dr. Kuang, ECF 124, is **DENIED as moot.**

4.    Plaintiff's Motion to Exclude Testimony of Dr. Salzburg, ECF 116, is **DENIED as moot.**

5.    Plaintiff's Motion to Certify Class for Count III Pattern or Practice Claim, ECF 182, is **DENIED as moot.**

DATED:  February 1, 2022

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

28